Sacks *v.* Sacks, Appellant.

Argued October 14, 1952. Before Rhodes, P. J., Hirt, Reno, Dithrich, Ross and Gunther, JJ. (Arnold, J., absent).

O. J. *Tallman*, with him *Tallman & Walker*, for appellant.

*Henry L. Snyder,* with him *Snyder, Wert & Wilcox,* for appellee.

OPINION BY ROSS, J., January 20, 1953:

In this divorce action, brought on the ground of desertion by a 69 year-old husband against his 56 year-old wife, the master who heard the case recommended that a decree of divorce be granted, the court below dismissed the wife's exceptions and granted the divorce, and the wife has appealed to this Court.

The marriage of the parties, the second for each, took place in Allentown on December 27, 1927. They established residence in their newly-built home at 1850 Chew Street in Allentown, where they lived with plaintiff's elderly mother and his son and daughter by a previous marriage. After a year marital troubles arose and in 1932 defendant, after finding a note addressed to the plaintiff, apparently from another woman and stating times when she was free to see him, left the home and went to Philadelphia, where she procured employment. After a period of separation of approximately a year a reconciliation was effected and defendant returned to the home, where she lived with plaintiff until the date of final separation, July 31, 1947.

Plaintiff was engaged in the business of selling coal and stoves and served for four years as councilman of the city of Allentown. In autumn of 1946 he developed a heart condition and cerebral disturbance which affected his right eye, the right side of his face and his hearing, and which prevented active participation in his business for several months. At the time of the hearings he remained under the care of his physician, his health had been restored only partially, and he was still unable to take charge of his business affairs as previously.

Defendant prior to the marriage agreed to have plaintiff's mother and children live with the parties. She had had no children by her previous marriage and seems to have been fond of plaintiff's children but found her mother-in-law difficult at times. When her parents died, defendant in 1941 inherited a sum of money. Sometime thereafter in 1944 or 1945, she began to make definite plans to build a home in the country. She testified that she determined to procure plans "about two years, three years" before she left the Chew Street residence. She gradually assembled articles of furniture and furnishings for the proposed home, which she stored in a third floor room. Plaintiff's son and daughter in the meantime had both married and moved to homes of their own. Defendant informed plaintiff that she had purchased a tract of land on the outskirts of Allentown as the site of the "dream house" (so characterized according to the testimony of her daughter-in-law, Jane Sacks), and at her request plaintiff accompanied her to see it. Plaintiff testified that he knew nothing of the purchase of the land until that time. Plaintiff objected to living in the country, according to his testimony, "but I couldn't stop her. I said she was foolish because, after all, she helped to select the building and helped to lay it out where we lived at, and we only lived twenty years there, and I don't think it's an old-fashioned home." Plaintiff's son and daughter testified that their father had suggested that their stepmother remodel the home they then occupied rather than spend money for a new house. However, defendant proceeded to have the house constructed and when it was completed she received an offer from a prospective purchaser. Plaintiff suggested that she sell it but she retained it, and on July 31, 1947 moved into it. Plaintiff was at home during lunchtime when the moving van arrived but at that time

made no effort to prevent the moving or persuade defendant to remain.

Our Divorce Law (Act of May 2, 1929, P. L. 1237, sec. 10 as amended, 23 PS sec. 10) provides that an innocent and injured spouse may secure a divorce whenever it shall be judged that the other spouse "shall have committed wilful and malicious desertion, and absence from the habitation of the innocent and injured spouse, without a reasonable cause, for and during the term and space of two years . . ." That defendant intended to remove from the matrimonial domicile is crystal clear. Having lived apart from her husband for the required statutory period, the burden was upon her to prove consent or a reasonable cause for her withdrawal from the matrimonial domicile. *Mertz v. Mertz,* 119 Pa. Superior Ct. 538, 180 A. 708. Defendant has based her defense on both these grounds. She contends that the separation was consensual because plaintiff at the time of actual moving failed to plead with her to remain. However, silent acquiescence is not consent; such negative evidence does not satisfy the legal requirement that there must be proof of some affirmative conduct amounting to participation in the separation. *Hochberg v. Hochberg,* 166 Pa. Superior Ct. 306, 70 A. 2d 864. Perhaps in an effort to qualify under this latter head, defendant points to plaintiff's gift to her of building materials which he had obtained through his business and which she used in the construction of the new home. The evidence shows that she asked him for them and he allowed her to have them. In our view, the gift falls short of constituting "affirmative conduct amounting to participation in the separation".

Defendant testified that she invited plaintiff to join her at the country home and that she held a bedroom in reserve for him. There is no evidence that the

common home of the parties was inadequate or run-down. On the contrary, Dr. Hope T. M. Ritter, family physician for many years of the parties and of plaintiff's family, characterized it "a very nice home". In any event, if exercised in good faith, the husband's choice of a home, according to his means, is controlling, and the wife in such circumstances must abide by his decision and live with him. *Ruf v. Ruf,* 168 Pa. Superior Ct. 632, 82 A. 2d 280; *Fuller v. Fuller,* 158 Pa. Superior Ct. 378, 45 A. 2d 231. When she fails to comply with this duty she is guilty of desertion, and no further offer of reconciliation need be made by the husband. *Barnes v. Barnes,* 156 Pa. Superior Ct. 196, 40 A. 2d 108.

Plaintiff's version of his attitude is summarized in the following pertinent excerpts from his testimony: "Q. Would you have been willing for your wife to remain with you? A. Absolutely. Q. In the house which she helped to design? A. Absolutely. . . . Q. Did you at any time tell her that she could not come back to the Chew Street home? A. No, never. . . . Q. Did you ask your wife to stay in your home that day [the day she moved]? A. Not that day. Q. When did you ask her? A. Before that. . . . Q. When your wife told you and you talked with her about building this house, did you tell her not to build it? A. I did. . . . Q. And when was that? A. Before she started it. Q. Was there at any time any remark on your part when you went out to see that land with your wife that you would live with her there? A. No, never. . . . Q. Did you say that you might live there with her? A. No, never. . . . Q. Did you want her to buy some land? A. No, and I told her yet that time. I discouraged her from buying it. . . . Q. Did you tell her that you thought she should not build it? A. I wanted her to stay where she was. . . . She said if I'd want to come out, I could come out. . . .

Q. Did you at any time want her to move into the house? A. Into the new one? Q. Yes. A. No, I wanted her to stay where she was. . . ."

As stated by the learned court below, the record presents a picture of a mass of conflicts, recriminations, charges and counter-charges. An example, which does not necessarily bear on the legal issues, is nevertheless illustrative. Defendant was reminded that at a prior hearing plaintiff had suffered an attack, a recurrence of his ailment. She replied that he was always "putting on acts", "so whether he was then putting one on, I don't know." Dr. Ritter testified that he never discovered at any time that plaintiff feigned illness. ("He wasn't that type of a man.") Defendant accused plaintiff of having contracted a social disease early in their marriage, which, however, was not transmitted to her, for which he was treated by a Dr. Noble, since deceased. Plaintiff admitted treatment but said it was for a condition caused by a sprain. Defendant denied that plaintiff had asked her to remain at the common abode or that he had objected to her leaving.

With regard to defendant's plea of justification for leaving the conflict of testimony is even more glaring. She testified that plaintiff was attentive to other women and named four of them specifically. One was the writer of the note which caused the 1932 separation, identified only as "Jackie". Plaintiff testified that he did not know who sent him the note. Another was the author of a letter which defendant found addressed to plaintiff, thanking him for flowers. Plaintiff explained that she was a novice in a religious seminary to which he had sent flowers which were left over at his office. The third was a woman with whom plaintiff had been friendly during the period of separation in 1932. The only serious charge of infidelity involved the fourth woman, the wife of one of plaintiff's

political associates. It appears that the parties associated socially with this couple for a period of time. Plaintiff continued the friendship but defendant discontinued association with them because she disapproved of the woman. A witness, Hilda Schweitzer, a waitress at a Coopersburg hotel, furnished the only really damaging testimony relative to the fourth woman. Plaintiff was a friend of the propietor, since deceased, and during the latter's illness visited him frequently. On one of these visits he was accompanied by his son, an attorney, for the purpose of writing the proprietor's will. The witness Schweitzer recited lurid details of plaintiff's visits there with "Ruth". No good purpose would be served by narrating those incidents, as the master found them incredible, and from our independent examination of the testimony, so do we. She testified that defendant did not know of plaintiff's visits to the hotel until she informed her of them *in 1950*, at which time defendant expressed complete surprise. Plaintiff denied improper conduct with the woman but admitted that she accompanied him to see the proprietor on several occasions and that they had had a few drinks there, but that that was all.

The master was equally disposed to discredit the testimony of the present licensee of the hotel, Rose Sopoth, who was called in rebuttal and who contradicted the testimony of the waitress categorically, on the ground that she seemed primarily motivated to protect the reputation of her establishment. He did place credence in Dr. Ritter, whom he described as "a physician of recognized ability and unquestioned reputation in the community". The doctor expressed the opinion that the conduct to which the waitress testified was highly improbable, if not impossible, considering plaintiff's age and physical condition.

Plaintiff countercharged that when he was running for office defendant met men at the apartment of a woman friend and stayed out late with them. Defendant denied the accusation. There was testimony also relative to meetings between her and a local veterinarian who, she admitted, bought her drinks when she would be sitting in a taproom. The testimony points toward the conclusion that the meetings were not altogether accidental but there is no evidence of actual wrongdoing.

In answer to defendant's charge that plaintiff drank excessively on occasion, his son testified that defendant drank with him, and she herself admitted doing so; and in answer to her charge that his father cursed a great deal, admitted that he did so but testified that defendant was guilty of the same practice, quoting a pet epithet which was frequently used by defendant to designate her mother-in-law—hardly becoming, in our judgment, to one who would complain of another's profanity. Plaintiff's daughter corroborated her brother on this point, and defendant admitted to cursing and testified that on one occasion she "raised hell".

It is thus apparent that the defense of justification for leaving (as does the entire issue of desertion) hinges on credibility of the witnesses. Where the truth lies must be garnered from the observations and findings of the master and the court below, in addition to what our own independent examination of the record reveals. It is true that a master's findings are advisory only, but where credibility is the pinch of the case, his findings in that regard are to be given fullest consideration (*Glick v. Glick*, 170 Pa. Superior Ct. 142, 84 A. 2d 248; *Wiggins v. Wiggins*, 171 Pa. Superior Ct. 298, 90 A. 2d 275), and they should not lightly be disregarded. *Sobotowich v. Sobotowich*, 165 Pa. Superior Ct. 60, 67 A. 2d 637. Our independent examination

of the record, which consists of almost 300 typewritten pages, confirms the master's appraisement of credibility.

The "reasonable cause" which is justification for husband or wife in quitting and abandoning the other, is that and only that which would entitle the separating party to a divorce. *Boughter v. Boughter,* 164 Pa. Superior Ct. 574, 67 A. 2d 812; *Darrall v. Darrall,* 164 Pa. Superior Ct. 113, 63 A. 2d 693. Although defendant's testimony reveals a quarrelsome and unhappy marriage in which her suspicions of plaintiff's attentions to other women played a predominant part, it fell short of proof of adultery. She thus failed to bring herself within the rule of *Copeland v. Copeland,* 155 Pa. Superior Ct. 102, 38 A. 2d 364, that a woman with an adulterous husband is not guilty of desertion when she refuses to live with him or requires him to leave her home. Evidence on her behalf, in our view, does not constitute such preponderance as would entitle her to a decree of divorce. *Partleton v. Partleton,* 169 Pa. Superior Ct. 485, 82 A. 2d 684.

In our opinion, the defendant has failed to meet the burden of proving that her separation was either consensual or justifiable and consequently the plaintiff is entitled to a divorce on the ground of desertion.

Decree affirmed.