Green, Appellant, *v.* Green.

Argued September 26, 1956. Before RHODES, P. J., GUNTHER, WRIGHT, WOODSIDE, ERVIN, and CARR, JJ. (HIRT, J., absent).

*I. Raymond Kremer,* with him *Robert N. C. Nix,* for appellant.

*Abraham T. Needleman,* with him *Nelson Romisher,* for appellee.

OPINION BY WOODSIDE, J., November 13, 1956:

In this case the court below refused the husband a divorce after the master had recommended that it be granted on the grounds of indignities and cruel and barbarous treatment.

The parties were married in 1932 and after several temporary separations finally parted in January 1949. They have one child, a daughter now in her early twenties. They were both 39 years of age at the time of the hearing, reside in Philadelphia, and are employed at the Quartermaster Depot of the Marine Corps.

They had been separated at the time the husband went into military service during World War II. While he was in the service, the wife wrote to him asking him to resume marital relations after he was discharged. This he agreed to do, sending her money which was used in the purchase of a house in which they lived from 1945 until they again separated. The wife put the title to this house in her own name, and thereafter refused to transfer it to both names. This was one of the irritating factors in the marriage.

The husband enjoyed music and sang with a quartet and church choir, spending considerable time rehearsing and giving concerts with the quartet. His wife did not care for "singers and musical instruments" and preferred to play poker. Thus, they spent much of their time going their own way.

The plaintiff testified that when Herbert Dickerson, a member of the quartet, was at plaintiff's home, his wife started an argument and threw a beer bottle at

him narrowly missing both him and his friend; that when he was taking two suits to the tailor one afternoon she grabbed them, cut them with a razor, and at the same time threatened to cut him; that at another time while he was sleeping she came into the room with a pipe wrench, threatened to kill him, and aimed a blow at his head with the wrench striking him on the arm which he had thrown up to protect himself; that another time he was awakened at night by having a bucket of hot water poured on him. If true, these acts constituted cruel and barbarous treatment.

The plaintiff further testified that his wife frequently berated and cursed him; falsely accused him of being out with prostitutes; embarrassed him in front of his friends; slashed his clothes with a razor; and did not prepare meals for him. On one occasion when he came home, he found his "clothes bundled up", and the door bolted so that he could not use his key to gain admittance to the house. If true, these acts constituted indignities.

The wife categorically denied all wrong doing. She testified that she did not throw a beer bottle at her husband, nor throw hot water on him, nor hit him with a wrench, nor cut his suits, nor swear at him nor threaten him. She claimed that she did make his meals and was a good wife to him. The daughter, too, testified that although she had lived with her parents during most of the time when the indignities and cruelties allegedly occurred, she had no knowledge of any of them ever having taken place.

The question is one of credibility; and the master who saw and heard the witnesses and observed their demeanor believed the plaintiff. While the master's findings are advisory only both upon the court below and upon this court, where credibility is involved his

findings in that regard are to be given the fullest consideration and should not be lightly disregarded. *Greer v. Greer,* 178 Pa. Superior Ct. 643, 115 A. 2d 794 (1955).

The court below expressed doubts as to the correctness of the findings (1) because the plaintiff did not produce Dickerson, whom he said was present when the beer bottle was thrown at him; and (2) because in the bill of particulars it was averred that the water thrown on the plaintiff was boiling water while the testimony indicated it was hot water, and that he was hit on the head with a wrench while the testimony established that he was hit on the arm.

The variations between the bill of particulars and the testimony are insignificant and do not warrant a rejection of the plaintiff's testimony on these points.

The defendant testified she knew Dickerson, and that he was in her home a number of times. If she did not know his address prior to the time of the first hearing on February 19, she at least knew it from then until the time of the last hearing on April 23. Whatever inference might be drawn from the failure of the plaintiff to call this witness would be of little value to the defendant as the general rule is that where a witness is equally available to both parties, no unfavorable inference can be asserted by either against the other for failure to call him. *Haas v. Kasnot,* 377 Pa. 440, 443, 105 A. 2d 74 (1954); *Moseley v. Reading Co.,* 295 Pa. 342, 349, 145 A. 293 (1929); *Sorby v. Three Rivers Motors,* 178 Pa. Superior Ct. 187, 193, 114 A. 2d 347 (1955). Wigmore on Evidence, 3rd Edition, Vol. 2, §288, page 169.

The lower court's refusal to grant the divorce was based, not so much upon its doubts concerning the evidence of cruelty and indignities, but upon its belief that the plaintiff was not an innocent and injured

spouse. This was on the ground that the plaintiff "stayed out late at night with great frequency and stayed out all night often."

The wife testified that the plaintiff started staying out all night about 1947 but "not too often" until the last six months prior to the separation in January 1949. During this period he often stayed away from their home during the entire weekend. The plaintiff had moved into a back room of the house,—he said, because "she told me I had to go in the back room and stay there," and she said, "he moved in the back room himself because he came in at four or five o'clock in the morning."

The wife thought there was "another woman" involved so she followed her husband and on one occasion saw him entering a taxicab after choir practice with Anne Timberlake who also sang in the choir. The daughter testified Anne had called the Green house about a dozen times and asked for Bill or Irene. The wife testified that she talked to Anne a number of times on the telephone.

In the years following the separation the defendant saw her husband and Anne walking together on the street once, and the daughter saw them together once on the street and once at a National Guard dance to which the plaintiff had taken his daughter.

Accepting all the testimony of the defendant and her witnesses as true, it falls short of establishing that the plaintiff was not "the innocent and injured spouse" as the term is used in The Divorce Law of May 2, 1929, P. L. 1237, §10, as amended, 23 PS §10.

Divorce is not restricted to those who are utterly without fault. *Boyles v. Boyles,* 179 Pa. Superior Ct. 184, 195, 116 A. 2d 248 (1955). That plaintiff's conduct may have been indiscreet or suspicious is not suf-

ficient to prevent his obtaining a divorce. *Rech v. Rech,* 176 Pa. Superior Ct. 401, 411, 107 A. 2d 601 (1954); *Boyles v. Boyles,* supra, at page 185. Staying out all night would not justify an attack upon him by his wife with a wrench or the throwing of hot water on him.

The evidence falls far short of establishing any adulterous relationship between the plaintiff and the girl with whom he was seen four times in as many years. Even if the evidence did establish such relationship *after* the separation, under the decisions of this Court and the Supreme Court for over a century, that would not warrant the refusal of a divorce on the grounds of cruelty and indignities. *Ristine v. Ristine,* 4 Rawle 460 (1834); *Clark v. Clark,* 160 Pa. Superior Ct. 562, 566, 52 A. 2d 351 (1947); *Bock v. Bock,* 162 Pa. Superior Ct. 506, 512, 58 A. 2d 372 (1948); *Hanson v. Hanson,* 177 Pa. Superior Ct. 384, 388, 110 A. 2d 750 (1955).

An independent review of the testimony brings us to the conclusion that the divorce should be granted.

The order refusing the divorce is reversed, and the record is remitted to the court below with direction to enter a decree of absolute divorce to the appellant on the grounds of cruel and barbarous treatment and indignities to the person.